IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.**

| | |
|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY | : No. 86 MAP 2012 |
| | : |
| | : Appeal from the order of Superior Court at |
| | : No. 277 EDA 2011 dated November 28, |
| v. | : 2011 Affirming the order of the Chester |
| | : County Court of Common Pleas, Civil |
| | : Division, at No. 09-6388 dated December |
| JOHN D. ST. JOHN AND KATHY M. ST. | : 20, 2010. |
| JOHN, INDIVIDUALLY AND D/B/A | : |
| THUNDER VALLEY FARM AND LPH | : ARGUED: May 7, 2013 |
| PLUMBING AND HEATING, LLC AND | : |
| STOLTZFUS WELDING AND REPAIR | : |
| | : |
| | : |
| APPEAL OF: JOHN D. ST. JOHN AND | : |
| KATHY M. ST. JOHN | : |

## OPINION

**MR. JUSTICE BAER**                **DECIDED: December 15, 2014**

In this matter, Appellants John D. St. John and Kathy M. St. John ("Appellants")

challenge the Superior Court's decision affirming the declaratory judgment order issued

by the Court of Common Pleas of Chester County, finding Pennsylvania National Mutual

Casualty Insurance Company ("Penn National") liable for a judgment against its insured

LPH Plumbing and Heating ("LPH Plumbing") under a policy of commercial general

liability (CGL) insurance in effect from July 1, 2003 to July 1, 2004. We granted review to

determine whether, pursuant to the facts of this case and the policy language at issue,

Penn National is instead liable for the judgment against its insured under a separate

policy of CGL insurance as well as a companion umbrella policy in effect from July 1, 2005 to July 1, 2006. We also consider whether the multiple trigger theory of liability insurance coverage adopted by this Court in J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502 (Pa. 1993), within the context of asbestos bodily injury claims applies in this case, where property damage was continuous and progressive, to trigger coverage under all policies in effect from exposure to the harmful condition to manifestation of the injury. For the reasons that follow, we affirm all aspects of the lower court's decision finding that coverage was triggered under the policy in effect from July 1, 2003 to July 1, 2004, when property damage became reasonably apparent, and declining to apply the multiple trigger theory of liability insurance coverage.

I.

In 2002, Appellants, co-owners of a dairy farm in Chester County, called Thunder Valley Farm, elected to expand the size of their dairy herd and milking facility. As part of their expansion project, Appellants hired LPH Plumbing to install a new plumbing system, which would include a wastewater drainage system and a separate freshwater drinking system for the expanded dairy operation. LPH Plumbing, in turn, subcontracted with Stoltzfus Welding ("Stoltzfus") to assist with welding metal pipes leading to a holding tank for the new freshwater drinking system. Construction on the expanded milking facility with the newly installed plumbing system was completed by July 1, 2003, at which time Appellants began full dairy operations in the expanded milking facility.

Unknown to Appellants, the plumbing system installed by LPH Plumbing was defective when dairy operations began. PVC piping used by LPH Plumbing for the wastewater was cracked which allowed "gray water," containing natural and chemical

waste byproducts produced during milking operations, to escape. Further, Stoltzfus failed to properly weld an intake pipe leading to a holding tank that formed a part of the freshwater drinking system for the dairy herd. Within a few months after the commencement of operations, gray water that escaped the PVC pipe migrated under the new milking facility and infiltrated the freshwater holding tank through the defective weld. As a result, Appellants' dairy herd was exposed to contaminated drinking water shortly after dairy operations began in July 2003. See Stipulation of Facts at Reproduced Record ("R.R.") 166a.

The gray water contamination caused various health and reproductive problems with the dairy herd, beginning as early as April 2004, and progressing with greater frequency, though intermittently, over the next few years. During this time, Appellants, unaware of the gray water contamination, consulted numerous veterinarians and nutritionists to help diagnose and remedy the dairy herd's various maladies, some of which were commonplace to dairy farming, like reduced milk production, ketosis, and metabolic disorders, and others rarer, such as laminitis, salmonella poisoning, and birth defects.[1] Appellants tested their water supply on a regular basis in compliance with farming regulations, but they did not discover the gray water contamination, as their testing was conducted at the wellhead rather than the holding tank. Appellants say they finally began to suspect that the dairy herd's drinking supply was the cause of their difficulties when, in March 2006, Appellants noticed the cows thrashing their heads in

_____

[1]    Laminitis is a foot disease that affects hooved animals, usually found in horses and cattle.   R.R. 274a, 334a.   Ketosis is a metabolic ailment that affects cattle usually during the first few weeks after giving birth to a calf.   R.R. 335a.

their drinking troughs and refusing to drink the water. After investigating further, Appellants discovered the aforementioned plumbing defects and the ongoing seepage of gray water into the dairy herd's drinking supply.

In 2007, Appellants brought suit in the Court of Common Pleas of Chester County against LPH Plumbing and Stoltzfus for the negligent installation of the plumbing system. LPH Plumbing was defended in this action by its liability insurer, Penn National, which covered LPH Plumbing under four policies of CGL insurance in effect, in aggregate, from July 1, 2003 through July 1, 2006 (hereinafter "Penn National policies"). The jury returned a verdict in favor of Appellants, finding LPH Plumbing and its subcontractor Stoltzfus jointly and severally liable for $3.5 million in damages with an additional $277,505.36 in delay damages.

LPH Plumbing appealed the verdict, and the Superior Court assigned the case to its appellate mediation program. Appellants, LPH Plumbing, and Penn National entered a memorandum of understanding, whereby LPH Plumbing agreed to discontinue its appeal and Penn National agreed to pay $1.2 million to Appellants in exchange for their waiver of all claims against its insured, LPH Plumbing. The $1.2 million represented the limit of liability under one of the Penn National policies in addition to a portion of the delay damages awarded by the trial court. Appellants retained the right to seek the remainder of the $3.5 million judgment directly from Penn National pursuant to the aforementioned CGL policies.

Meanwhile, Penn National filed a declaratory judgment action in the Court of Common Pleas of Chester County to determine its rights and responsibilities under the four Penn National policies in effect during the relevant time periods. Three of these

policies were year-long CGL policies, with the first covering the period July 1, 2003 to July 1, 2004; the second covering the period July 1, 2004 to July 1, 2005; and the third covering the period July 1, 2005 to July 1, 2006.[2] The fourth policy provided umbrella coverage for the period July 1, 2005 to July 1, 2006. Each policy carried a $1 million coverage limit. In its declaratory judgment action, Penn National sought a determination regarding which policies were triggered by LPH Plumbing's negligent installation of the plumbing system on Appellants' dairy farm. Penn National contended that it was answerable for LPH Plumbing's liabilities only under the policy of insurance in effect from July 1, 2003 to July 1, 2004, when injuries first manifested. Appellants counterclaimed, seeking a declaration that the liability imposed on LPH Plumbing in the underlying dairy farm litigation triggered the two policies in effect for the period July 1, 2005 to July 1, 2006, when they discovered the gray water contamination. In the alternative, Appellants sought a declaration that LPH Plumbing's liability triggered each of the four CGL policies pursuant to a multiple trigger theory of liability insurance coverage.

Under the terms of the CGL policies at issue, Penn National agreed to indemnify LPH Plumbing for its liabilities arising from either bodily injury or property damage that occurred during the respective policy periods, making these "occurrence" policies.[3] The insuring agreements for the CGL policies provided in relevant part:

---

[2] It appears that each annual policy period begins at 12:01 a.m. on July 1 of the first year and ends at 12:01 a.m. on July 1 of the second year, the moment the next policy year begins.

[3] An occurrence policy is defined as "[a]n agreement to indemnify for any loss from an event that occurs within the policy period, regardless of when the claim is made." Black's Law Dictionary 810 (7th ed. 2009). In contrast, a claims-made policy is "[a]n (continued…)

(a) [Penn National] will pay those sums that the insured [LPH Plumbing] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies . . . .

* * *

(b) This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who is An Insured and no "employee" authorized by [LPH Plumbing] to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

CGL policy at Section I, Subsection (1)(b)(1-3); R.R. 387a.[4]  The CGL policies defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Id. at Section V, Subsection (13); R.R. 400a.  They defined "property damage" in relevant part as "[p]hysical injury to tangible property, including all resulting loss of use of that property"; while "[a]ll such loss

---

(…continued)

agreement to indemnify against all claims made during a specified period, regardless of when the incidents that gave rise to the claims occurred."  Id. at 809; see also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 892 n.1 (Pa. 2006) (observing that "[a]n 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy.") (internal citation omitted).

[4]    The relevant language in each of the primary CGL policies issued by Penn National to LPH is identical, while the language in the umbrella CGL policy follows the form and the language of the other primary CGL policies.

of use [was] deemed to occur at the time of the 'occurrence' that caused it." Id. at Section V, Subsection (17); R.R. 401a.[5]

Penn National and Appellants stipulated to the following facts regarding their opposing declaratory judgment actions: (1) the damage that LPH Plumbing's negligence caused Appellants' dairy herd constituted "property damage" as that term was defined under each of the policies; (2) the property damage to Appellants' dairy herd "took place during the policy period of each of the Penn National policies of liability insurance at issue"; and (3) no exclusions from coverage under the policies of liability insurance applied. Stipulation of Facts at R.R. 165a-168a. Notably, the stipulations did not specify which event or events constituted an occurrence under the CGL policies. Neither did the stipulations identify a precise point in time when the occurrence or occurrences causing injury to the dairy herd first arose such that coverage was triggered.

At a non-jury trial held on June 10, 2010, Appellants offered testimony regarding the nature of the injuries sustained by the dairy herd and the timing in which these injuries first manifested themselves. Appellants explained that they first encountered problems with the dairy herd in April 2004, when they experienced a significant drop in milk production. Appellants described a drop in milk production as an unwanted occurrence,

---

[5] The CGL policies issued by Penn National further provided that:

"Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured . . . includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

CGL policy at Section I, Subsection (1)(c); R.R. 387a.

but also as a circumstance common to dairy farming that is attributable to a wide range of possible causes. Accordingly, when milk production dropped in April 2004, and continued to fluctuate over the next few years, Appellants did not suspect that the dairy herd's water supply was contaminated with gray water. Notes of Testimony ("N.T."), 6/10/2010, at R.R. 302a-06a.

Appellants further testified that as of April 2004, the dairy herd began experiencing other health problems, including metabolic disorders, laminitis, ketosis, salmonella poisoning, and birth defects. According to Appellants, the levels at which these health issues initially manifested themselves were not unusual to dairy farming. Rather, the various health problems increased in frequency over time until eventually they were occurring at rates higher than expected for normal dairy farm operations. [6]

---

[6]  On direct examination, Appellants testified:

Q. Now, when you first had the drop in milk production in 2004, did you have increased [health problems] occurring at that point in time or was it later in time that you experienced that on the farm?
A. It was progressively from that point, you know, as we look back over the records, it was from that point forward that it gradually started getting more and more a higher percentage of . . . metabolical disorders, more fevers, ketosis and things like that.
Q. And did that happen in a gradual increase?
A. Yes, over time, a gradual increase, yes.
Q. And did it become a circumstance where those percentages were higher than anticipated in a run-of-the-mill dairy operation?
A. That's right, yes.
Q. But they didn't start out that way, right?
A. No. It was a gradual process.

R.R. 307a-08a. On cross-examination, Appellants testified further:

(continued…)

Notwithstanding the health problems affecting their dairy herd, Appellants avowed they did not suspect that their dairy herd's water supply was contaminated until March 2006, when they noticed the cows thrashing their heads in their drinking troughs and refusing to drink.

On August 31, 2010, the trial court entered an order declaring Penn National liable for paying the judgment against LPH Plumbing only under the CGL policy in effect for the period July 1, 2003 to July 1, 2004. The trial court concluded that the underlying events constituted a single occurrence, which happened when the effects of LPH Plumbing's negligence first manifested in April 2004 with the drop in milk production. Appellants filed a motion for post-trial relief, and the trial court denied the motion without opinion. Thereafter, Appellants appealed to the Superior Court.

---

(…continued)

> Q. And, obviously, with remarkable or rare events you were experiencing those where in the past you had little or perhaps no experience with these remarkable or rare events, they were happening in April of 2004, correct?
> A. That characterization is not correct. I mean, in the old facility there was times where we would find something that would be similar to what we were experiencing in the new facility and we would take appropriate management things to correct them, yes.
> Q. But what was truly remarkable about April, 2004 was that never before had you experienced milk fever, drop in milk production, deformed calves, calves that wouldn't eat, calves that you had to force feed, use IV's, conception problems, salmonella, laminits, metabolic disorders, DA's, ketosis, and mycoplasmas all at the same time, that is not something you had any experience with, correct?
> A. The time period that you're saying, 2004, we hadn't experienced all the things you had mentioned. The things that you just mentioned was over the time period to when we discovered [the contaminated drinking water in March 2006], that's what my recollection is.

R.R. 345a-46a.

In their statement of errors complained of on appeal, filed pursuant to Pa.R.A.P. 1925(b), Appellants raised the same two issues they argued in their motion for post-trial relief. First, Appellants argued that the initial manifestation of injury, and thus the only occurrence, happened no earlier than March 31, 2006, when Appellants discovered the contaminated drinking water. In so arguing, Appellants sought coverage under both the CGL policy and the umbrella policy in effect from July 1, 2005 to July 1, 2006. Second, Appellants argued, in the alternative, that the gradual progression of various diseases and disorders affecting the dairy herd between April 2004 and March 2006 constituted multiple or continuous occurrences, thus triggering each policy at issue pursuant to the multiple trigger theory of liability insurance coverage adopted by this Court in J.H. France Refractories v. Allstate Ins. Co., as applied to asbestos-related disease claims. 626 A.2d 502 (Pa. 1993).

In a Rule 1925(a) opinion, the trial court explained that an occurrence triggers coverage under one of the CGL policies when the effect of a negligent act first manifests itself in a manner that would put a reasonable person on notice of damage to personal property, the so-called "first manifestation rule." See Consulting Engineers, Inc. v. Ins. Co. of North Amer., 710 A.2d 82 (Pa.Super. 1998), affirmed on the basis of the opinion of the Superior Court, 743 A.2d 911 (Pa. 2000), citing D'Auria v. Zurich Ins., 507 A.2d 857 (Pa.Super. 1986). The trial court concluded that the effects of LPH Plumbing's negligent installation of the plumbing system were obvious to Appellants in April 2004, or, in any event, no later than June 30, 2004. The trial court observed:

> The illnesses and ailments being suffered by the cows were numerous and obvious, including a decrease in milk production, increase in general health problems, increase in deformed calves, and salmonella, laminitis and

metabolic disorders. [Appellants] [do] not dispute observing these conditions during the term of the policy period of the first policy set forth above [in effect from July 1, 2003 to July 1, 2004].

Tr. Ct. Op. at 4 (Apr. 22, 2011). The fact that Appellants did not discover the reason for the dairy herd's ailments until March 2006 was of no moment to the trial court, as long as Appellants were clearly aware of the problems caused by LPH Plumbing's negligence in April 2004. Accordingly, the trial court concluded that an occurrence happened during the period July 1, 2003 to July 1, 2004, triggering the policy in effect during that period only.

The trial court further rejected Appellants' contention that the facts of the case warranted application of the multiple trigger theory of liability such that the continuous and progressive damage sustained by the dairy herd as a result of the negligent installation of the plumbing system gave rise to multiple occurrences during each of the applicable periods, and thereby triggered all four CGL policies at issue. The trial court deemed the "multiple trigger" theory of liability inapplicable given that, at least to date, Pennsylvania appellate courts have declined to apply the "multiple trigger" theory outside of latent disease cases, like asbestosis or mesothelioma. See Consulting Engineers, 710 A.2d at 87; see also J.H. France, 626 A.2d 502. Quoting language from Consulting Engineers, the trial court reasoned that "[t]he overriding concern in latent disease cases is that the application of the D'Auria 'first manifestation' rule would allow insurance companies to terminate coverage during the long latency period (of asbestosis)." Consulting Engineers, 710 A.2d at 87 (internal citations omitted). Because the damage sustained by the dairy herd did not lay dormant for an extended period of time, the trial court

defended its decision to utilize the D'Auria first manifestation rule as opposed to the multiple trigger theory for determining the trigger of coverage in this case.

The trial court found additional support in Donegal Mutual Ins. Co. v. Baumhammers, 938 A.2d 286 (Pa. 2007), where this Court adopted the "cause of loss" approach for determining the number of occurrences for the purpose of triggering coverage under a policy of liability insurance. Pursuant to the "cause of loss" approach, the number of occurrences under a policy of liability insurance is determined by looking to the insured's underlying negligence that gave rise to the injury or damage. In Baumhammers, this Court held that the negligence of two parents in supervising their child gave rise to a single occurrence, even though as a result of their negligence the child went on a shooting spree, killing five people and seriously injuring a sixth person. Applying the same analysis to this case, the trial court concluded that the damage sustained by Appellants' dairy herd constituted a single occurrence, as it stemmed from a single negligent act when LPH Plumbing improperly installed the plumbing system on the dairy farm.

In a memorandum opinion, a divided Superior Court panel affirmed the trial court decision, finding Penn National liable only under the policy of CGL insurance in effect from July 1, 2003 to July 1, 2004. The Superior Court agreed that the "first manifestation" rule adopted in D'Auria and followed in Consulting Engineers served as the appropriate test for determining when an occurrence happens pursuant to a policy of commercial general liability insurance, like the Penn National policies. See Consulting Engineers, 710 A.2d at 87 (explaining that "[a]n occurrence [for purposes of determining insurance coverage] happens when the injurious effects of the negligent act *first manifest*

*themselves* in a way that would put a reasonable person on notice of injury.") (quoting D'Auria, 507 A.2d at 861) (emphasis in original). Treating the timing of manifestation as a question of fact that must be reviewed for abuse of discretion, the Superior Court concluded that the record contained sufficient evidence to support the trial court's finding that the damage to the dairy herd was manifest in 2004, when there was a significant decline in milk production, followed by a variety of other health problems. Thus, the Superior Court rejected Appellants' argument that the damage to the dairy herd did not manifest until Appellants apprehended the cause of the damage in March 2006, concluding that adoption of that theory would involve an impermissible re-weighing of the evidence.

Like the trial court, the Superior Court also declined to apply the multiple trigger theory of insurer liability and find that the continuous and progressive damage sustained by the dairy herd between 2003 and 2006 constituted a series of multiple occurrences, which triggered each of the four CGL policies at issue. The Superior Court read Consulting Engineers, which this Court affirmed on the basis of that court's opinion, as an express refusal to extend the multiple trigger theory of liability adopted in J.H. France beyond asbestos or other toxic tort scenarios. See Consulting Engineers, 710 A.2d at 87-88 (declining to apply the multiple trigger theory to determine trigger of coverage under various CGL policies for injuries arising from the tort of wrongful use of civil proceedings). Accordingly, the Superior Court refused to follow caselaw from other jurisdictions that would support extending the multiple trigger theory to this case. Following the "cause of loss" test and the "first manifestation" rule articulated in Baumhammers and D'Auria, respectively, the Superior Court held that the negligent

installation of the plumbing system gave rise to only one occurrence of compensable loss in 2004.

Judge Bowes dissented, contending that the certified record lacked competent evidence to support the trial court's finding that the effects of LPH Plumbing's negligent installation of the plumbing system first manifested in April 2004. She disagreed with the trial court's findings that the "illnesses and ailments being suffered by the cows [during the first policy period] were numerous and obvious" and that "[Appellants] did not dispute observing these conditions during the term of the . . . first policy set forth above." Tr. Ct. Op. at 4. Judge Bowes pointed to testimony offered by Appellant at trial indicating that, apart from fluctuations in milk production, the health issues with the dairy herd did not suddenly appear in 2004, but developed gradually and inconsistently over the various policy periods. See supra, note 6. Judge Bowes further emphasized testimony indicating that milk fluctuations were an expected occurrence within the dairy industry, as were most of the other health complications encountered between April 2004 and March 2006. Judge Bowes thus concluded that the effects of LPH Plumbing's negligence were not apparent prior to the end of the policy period of the first CGL policy in effect from July 1, 2003 to July 1, 2004.

Judge Bowes did not specify when she thought the property damage first manifested. Rather, she opined that she would have accepted Appellants' alternative argument that the injuries sustained by the dairy herd constituted continuous and progressive property damage warranting application of the multiple trigger theory of liability adopted by this Court in J.H. France, and, therefore, would have granted Appellants' demand for coverage under each of the four CGL policies. While

recognizing that Pennsylvania courts generally follow the "cause of loss" test articulated in Baumhammers when construing insurance coverage under commercial general liability policies, Judge Bowes advocated adopting the multiple trigger theory of liability in property damage cases, like this one, where there is indivisible, progressive harm that manifests after a prolonged period of latency. Judge Bowes argued that Consulting Engineers, far from restricting application of the multiple trigger theory of liability exclusively to toxic torts and latent disease cases, recognized the applicability of the formulation to cases, like J.H. France, where the injuries do not manifest until after the injury-causing event occurs. Finally, Judge Bowes maintained that application of the multiple trigger theory of liability in this case would best effectuate the reasonable expectations of the parties pursuant to the underlying CGL policies.

Appellants timely appealed the Superior Court's memorandum decision, raising the following three issues:[7]

> (1) Did "manifestation" of the "property damage" to [Appellants'] dairy herd take place in late March 2006 when the cows were concurrently observed thrashing their heads about in their water bowls, refusing to drink, and giving dramatically less milk; rather than, as held by the trial court, in April

---

[7] For the first time in its brief to this Court, Penn National contends that Appellants failed to preserve the first two issues that Appellants raised in their Petition for Allowance of Appeal. Penn National identifies various discrepancies between the wording of these issues in Appellants' Petition for Allowance of Appeal and the wording Appellants used in the phrasing of their issues in their Rule 1925(b) statement. Penn National's contention is meritless. While Appellants rephrase the first two issues raised in their Rule 1925(b) statement and consolidate the second two, the substance of their claims are preserved. Appellants raise the same issues on appeal to this Court as they presented to the Superior Court - namely, whether property damage to Appellants' dairy herd first manifested in March 2006 as opposed to April 2004, and whether the "multiple trigger" theory of liability insurance coverage as adopted in J.H. France applies to cases like this one involving continuous, progressive property damage.

2004 based on a mere economic downturn from a decrease in milk production?

(2)   Does "manifestation" of "property damage" for purposes of triggering a commercial general liability insurance policy take place only after the injured party has the ability to ascertain the source of injury or damage is traceable to something out of the ordinary and usual course of events for which another may bear responsibility?

(3)   Does the "multiple trigger" theory of liability insurance coverage adopted by the Pennsylvania Supreme Court in J.H. France Refractories Co. v. Allstate Ins., 626 A.2d 502, 507 (Pa. 1993), apply to cases presenting continuous, progressive "property damage," so that all policies on the risk from exposure to the harmful condition through "manifestation" of the injury are triggered?

Brief of Appellant at 2.   Appellants' first and second issues are substantially related, and can be addressed together, as they both concern manifestation of property damage under the Penn National policies.   Following our discussion of Appellants' first two issues, we will turn to Appellants' third issue regarding the applicability of the multiple trigger theory.

II.

Applicable to the first two issues only, Appellants proceed under the assumption that this Court will apply the "cause of loss" test to identify the number of occurrences under the Penn National policies, see Baumhammers, 938 A.2d 286, and will utilize the "first manifestation" rule to determine when an occurrence manifests triggering insurance coverage, see D'Auria, 507 A.2d 857.   For purposes of their argument, Appellants agree with the trial court and Superior Court that there was only one occurrence as defined by the Penn National policies, namely LPH Plumbing's negligent installation of the plumbing system in 2003.   Appellants, further concur that in accordance with the first manifestation rule, coverage under the Penn National policies is not triggered until the effects of the

occurrence, here the negligent installation of the plumbing system, manifest in a manner that would put a reasonable person on notice of injury. However, Appellants disagree with the trial court's determination that the effects of LPH Plumbing's negligent installation of the plumbing system first manifested in April 2004, when there was a substantial drop in milk production and instead argue that the effects of LPH Plumbing's negligence first manifested in March 2006, when they discovered the gray water contamination.

Appellants acknowledge that the dispositive language for applying the first manifestation rule, otherwise known as the "effects" test, is found in D'Auria, the first Pennsylvania case to apply the rule. In articulating the rule, derived from the Third Circuit's decision in Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3d Cir. 1982), the Superior Court held that a policy of commercial general liability insurance is triggered "when the injurious effects of the negligent act *first manifest themselves* in a way that would put a reasonable person on notice of injury." D'Auria, 507 A.2d at 861 (emphasis in original). The Superior Court further observed that "an 'occurrence' happens when *injury* becomes reasonably apparent, *not* at the time the *cause* of the injury occurs." Id. at 862 (emphasis in original). Accordingly, the Superior Court in D'Auria held that physical injury caused by a doctor's failure to diagnose his patient's ongoing renal deterioration manifested for purposes of determining coverage under a policy of medical malpractice insurance when the condition was diagnosed, as opposed to when the patient later suffered complete renal failure. Id.

Appellants contend that the trial court and Superior Court adopted too low a threshold for determining when property damage manifests for liability insurance coverage purposes. Appellants argue that, consistent with a proper understanding of

D'Auria, manifestation for liability insurance coverage purposes happens only once there are facts and circumstances sufficient to permit association of the injury or damage with something out of the ordinary course of events for which another party may bear responsibility. In other words, for an injury to be manifest, the cause of injury must be sufficiently ascertainable.

Appellants find support in J.H. France for their argument that application of the first manifestation rule requires (a) recognition of injury, and (b) recognition that the injury is attributable to an outside causative force or agency. Appellants rely on language in J.H. France where this Court concluded that for purposes of the multiple trigger theory of liability insurance coverage in the context of asbestos bodily injury claims, manifestation, which serves as the final triggering event and cuts off further coverage, requires incapacitation amounting to a "recognizable disease." J.H. France, 626 A.2d at 507. Appellants reason that just as this Court in J.H. France declined to find manifestation of the plaintiff's injuries until asbestosis was diagnosed, we should find that the current Penn National policies were not triggered until the cause of the property damage became apparent.

Appellants further and alternatively contend that the trial court erred in treating the decline in milk production in April 2004, as a manifestation of injury because, according to Appellants, a decline in milk production does not constitute a "physical injury to tangible property," under the definition of property damage in the Penn National policies. Rather, Appellants argue that the decline in milk production constituted a purely economic injury,

and therefore could not have triggered the first Penn National policy in effect from July 1, 2003 to July 1, 2004.[8]

Finally, consistent with Judge Bowes' dissent, Appellants dispute the trial court's finding that the "illnesses and ailments being suffered by the cows [during the first policy period] were numerous and obvious." Tr. Ct. Op. at 4. Specifically, Appellants argue there is an "abject lack of record support for the trial court's factual finding" that during the first policy period their dairy herd suffered from a dramatic increase in general health problems, including salmonella, laminitis and various metabolic disorders. Reply Brief of Appellants at 9. Appellants maintain that the record only supports the trial court's finding that milk production fluctuated in 2004, and that the other health problems identified by the trial court occurred gradually after April 2004. In any event, Appellants argue that even if the trial court is correct in its characterization of the maladies experienced by the dairy herd during the first policy period, we should still find that property damage manifested in March 2006, consistent with their explication of the first manifestation rule, supra.

Accordingly, Appellants urge this Court to "clarify that neither bodily injury nor property damage manifests until the injured party is able, in the exercise of reasonable diligence, to ascertain that the injury or damage is fairly traceable to some outside

---

8       To the extent that Appellants argue that the decline in milk production was not property damage, we find their argument waived, as Appellants failed to argue this point previously. See Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). In any event, as we explain infra, Appellants' argument is meritless given that the definition of property damage under the Penn National policies encompasses the loss of use of tangible property.

causative force or agency."   Brief of Appellants at 25.   Consistent with this construct of the first manifestation rule, Appellants contend that none of the various health problems the dairy herd experienced between 2004 and 2006 – all of which Appellants assert were common to dairy operations – constituted manifestation of property damage.   Rather, Appellants argue that the effects of LPH Plumbing's negligent installation of the plumbing system first manifested in March 2006, when Appellants noticed the cows thrashing their heads in the water troughs which alerted them to the existence of an "outside force or agency" as the reason for the dairy herd's various maladies.   Brief of Appellant at 18. As such, Appellants seek coverage under the two Penn National policies in effect from July 1, 2005 to July 1, 2006.

In response, Penn National argues that Appellants lack legal and factual support for their contention that property damage resulting from LPH Plumbing's negligent installation of the plumbing system did not manifest until March 2006.   Penn National maintains that pursuant to relevant case law, an "occurrence" under a policy of general liability insurance takes place when the injury, not the cause, manifests in a way that can be ascertained by reasonable diligence.   D'Auria, 507 A.2d at 86162 (citing Appalachian Ins. Co., 676 F.2d 56).   Penn National, therefore, would have us affirm the trial court's holding that physical damage resulting from LPH Plumbing's negligence manifested in 2004 when, as Penn National describes it, the dairy herd suffered from laminitis, salmonella poisoning, metabolic disorders, birth defects, increased health problems, and fluctuations in milk production.

To discern the proper application of the first manifestation rule, Penn National directs us to the Third Circuit's decision in Appalachian Ins. Co., which served as the

basis for the Superior Court's holding in D'Auria.[9]  The Third Circuit explained that an occurrence manifests for purposes of triggering coverage when "the 'result' [takes place], that is, the time when the accident or injurious exposure produces personal injury." Appalachian Ins. Co., 676 F.2d at 61-62 (citations omitted).   In Appalachian Ins. Co., the insured, Liberty Mutual, adopted discriminatory employment policies in 1965 which harmed various female employees.   The Third Circuit concluded that the injuries to the female employees first manifested for purposes of determining coverage under a policy of liability insurance when Liberty Mutual promulgated the discriminatory insurance policies in 1965.   Id. at 63.   By extension, Penn National argues that the effects of LPH Plumbing's negligence first manifested as early as April 2004, when physical damage from the gray water contamination was first detectable.

Penn National challenges Appellants' contention that in D'Auria the Superior Court linked the manifestation of injury to actual knowledge of the cause of harm.   Penn National avers that "[k]nowledge of the cause of the harm was neither required, nor relevant, nor even mentioned in D'Auria."   Brief of Appellee at 20.   To the extent that Appellants associate manifestation with knowledge of legal causation or a valid cause of action, Penn National asserts that Appellants fail to cite a single Pennsylvania case that required either knowledge of legal causation or a cause of action before an injury manifests and coverage under a policy of general liability insurance is triggered.   Penn National maintains that an injured party's discovery of a tort action is irrelevant to an insurance contract trigger of coverage analysis.

---

[9]     In Appalachian Ins. Co., the Third Circuit refers to the first manifestation rule as the "effects" test.   Appalachian Ins. Co., 676 F.2d at 62.

Finally, Penn National argues that Appellants' reliance on J.H. France for the proposition that manifestation of injury requires a diagnosis of injury or identification of the cause of damage is misplaced. Reading J.H. France as creating a narrow rule applicable only to asbestos bodily injury claims, Penn National contends that associating manifestation of asbestos-related injuries with diagnosis of the related diseases is unique to asbestos bodily injury claims, and should not be broadened to apply to other forms of injury. Moreover, Penn National contends that even if this Court finds that this aspect of J.H. France applies, and accepts Appellants' argument that the first manifestation rule requires an identification of the cause of the property damage, the evidentiary record still supports the trial court's determination of when manifestation took place. According to Penn National, the fact that the dairy herd was diagnosed with salmonella poisoning, laminitis, and ketosis during the first policy period was sufficient to place Appellants on notice that their difficulties were the result of the dairy herd's contaminated drinking water.

Appellants' first two issues regarding whether property damage to the dairy herd initially manifested in 2004 or 2006 for purposes of triggering coverage under the Penn National policies in effect during those respective time periods present mixed questions of law and fact. While identifying the timing and nature of physical injury requires fact finding by the trial court, determining whether these physical injuries trigger coverage by manifesting themselves in a manner that would put a reasonable person on notice of injury is a question of law. Baumhammers, 938 A.2d at 290. When reviewing such mixed questions,

> to the extent that factual findings and credibility determinations are at issue,
> we will accept the trial court's conclusions insofar as they are supported by
> the record. To the extent that a legal question is at issue, a determination

by the trial court will be given no deference and will instead be reviewed *de novo*.

Messina v. E. Penn Twp., 62 A.3d 363, 366 (Pa. 2012) (citation omitted); see also Pocono Manor Investors, LP v. Pa. Gaming Control Bd., 927 A.2d 209, 229 n.14 (Pa. 2007). Given the parties' stipulation that property damage took place during each of the policy periods at issue, our inquiry focuses on the proper interpretation and application of the language contained in the four CGL policies, which presents a question of law over which our scope of review is plenary and standard of review *de novo*. Baumhammers, 938 A.2d at 290; Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526, 532-33 (Pa. 2010).

Appellants' first two issues address the trigger of coverage under the Penn National policies. The expression "trigger of coverage" is used to describe the event that must take place during a policy period for coverage under a policy of insurance to take effect. A.W. Chesterton Co. v. Mass. Ins. Insolvency Fund, 838 N.E.2d 1237, 1250 (Mass. 2005); 45 C.J.S Insurance § 640 (2012). Courts have generally applied one of five theories for determining which event triggers coverage under a policy of third party liability insurance. See 14 A.L.R. 5th 695. These theories include: wrongful act (coverage triggered when wrongful act is committed); exposure (coverage triggered when injured person or damaged property is first exposed to harm); first manifestation (coverage triggered when harm is first manifested); continuous or multiple trigger (coverage triggered under every policy between time of exposure until manifestation of harm); and injury in fact (coverage triggered when claimant suffers injury). Id. Identifying the appropriate trigger of coverage under a policy of insurance turns upon the

language of the respective policy, and requires a careful investigation of the factual circumstances comprising the claim. See Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (characterizing the plain language of the insurance policy at issue as the polestar of the Court's analysis).

The goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy. 401 Fourth St. Inc. v. Investors Ins. Grp., 879 A.2d 166, 171 (Pa. 2005); Lititz Mut. Ins. Co. v. Steely, 785 A.2d 975, 978 (Pa. 2001). When the language of an insurance policy is plain and unambiguous, a court is bound by that language. 401 Fourth St. Inc., 879 A.2d at 171. Alternatively, if an insurance policy contains an ambiguous term, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." Id. Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning. Lititz Mut. Ins., 785 A.2d at 978. Finally, the language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety. Riccio v. Am. Republic Ins. Co., 705 A.2d 422, 426 (Pa. 1997).

Pertinent to the first two issues only, Appellants and Penn National agree, that the first manifestation rule is the appropriate theory for determining coverage under the Penn National policies; however, they differ on its precise meaning and application to the facts of this case. Penn National contends that manifestation happens when the injury, not the cause of injury, manifests in a way that can be ascertained by reasonable diligence. Meanwhile, Appellants maintain that manifestation happens when the injured party is

able, through the exercise of reasonable diligence, to ascertain that the injury or damage is fairly traceable to an outside causative force or agency. For the reasons that follow, we reject Appellants' contention that application of the first manifestation rule for determining trigger of coverage under a third party liability insurance policy requires the cause of injury to be known or reasonably discoverable.

First, Appellants' explication of the first manifestation rule is misguided to the extent it conflates a trigger of coverage analysis with the discovery rule used by Pennsylvania courts to toll the statute of limitations in cases involving latent injuries. See Wilson v. El-Daief, 964 A.2d 354, 361-62 (Pa. 2009) (explaining that, per application of the discovery rule, the statute of limitations is tolled until an injured party discovers or reasonably should discover, (1) that she has been injured and (2) that her injury has been caused by another party's conduct). While knowledge of the cause of injury is pertinent to determining the date on which the statute of limitations begins to run, it has no special relevance to determining the date an insurance policy is triggered, unless specifically required by the language of the applicable policy of insurance. Compare Wilson, 964 A.2d at 362 n.3 (explaining that tolling the statute of limitations until the cause of injury is reasonably discoverable is necessary to protect the litigation rights of persons who suffer latent injuries) with Kvaerner Metals Div., 908 A.2d at 897 (holding that the primary goal when interpreting an insurance contract is to ascertain the intent of the parties as manifested by the language of the specific insurance policy).[10]

---

[10] Indeed, the date on which the statute of limitations is triggered and the date on which coverage under a policy of insurance is triggered will often differ, as the two events serve distinct functions and reflect different policy considerations. The former serves to (continued…)

Here, the language of the Penn National policies does not support Appellants' contention that coverage is triggered under the policies when both injury and its cause are reasonably ascertainable. The policy language plainly states that coverage is triggered when "'bodily injury' or 'property damage' occurs during the policy period[.]" CGL policy at Section I; Subsection (1)(b)(2); R.R. 387a. Property damage is defined as either "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." Id. at Section V, Subsection (17); R.R. 401a. Bodily injury is defined as "injury, sickness or disease sustained by a person." Id. at Section V, Subsection (3); R.R. 399a. Accordingly, coverage is triggered under one of the Penn National policies when any of the following are reasonably ascertainable: physical injury to tangible property, loss of use of tangible property, bodily injury, sickness, or disease. The Penn National policies contain no language requiring the cause of injury to be identifiable before coverage is triggered.

Our interpretation of the Penn National policies is confirmed by comparable cases applying the first manifestation rule to determine trigger of coverage under third party liability insurance policies. These cases consistently identify the initial manifestation of injury as the trigger of coverage. See D'Auria 507 A.2d at 862 ("[A]n 'occurrence' happens when *injury* is reasonably apparent, *not* at the time the *cause* of injury occurs.") (emphasis in original); Appalachian Ins. Co., 676 F.2d at 61 ("in this type of case the occurrence takes place when the injuries first manifest themselves"); see also Consulting

_____

(…continued)

expedite litigation and preclude stale claims, while the latter seeks to effectuate the reasonable expectations of the parties to the insurance contract. Consulting Engineers, 710 A.2d at 86; City of Erie v. Guaranty Nat. Ins. Co., 109 F.3d 156, 161 (3d Cir. 1997).

<u>Engineers</u>, 710 A.2d 82 (applying the first manifestation rule as articulated in <u>D'Auria</u>); <u>Keystone Automated Equipment Co., Inc. v. Reliance Ins. Co.</u>, 535 A.2d 648 (Pa.Super. 1988) (same); <u>Guaranty Nat. Ins. Co.</u>, 109 F.3d 156 (same); <u>Fletcher v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n</u>, 27 A.3d 299 (Pa.Commw. 2011) (same). The cases Appellants rely on where the first manifestation of injury coincides with the identification of the cause of injury are distinguishable, as the correlation in these cases between manifestation of injury and identification of its cause is merely incidental. <u>See</u> <u>D'Auria</u>, 507 A.2d 857 (holding that the effects of injury caused by a doctor's failure to diagnose manifested no later than the date renal failure was discovered by an alternative physician); <u>Consulting Engineers</u>, 710 A.2d 82 (holding that the effects of an injury caused by the tort of wrongful use of civil proceedings first manifested when the wrongful suit was filed); <u>Appalachian Ins. Co.</u>, 676 F.2d 56 (holding that the effects of injury caused by discriminatory employment policies first manifested when the policies were implemented). In these cases, there was no potential for an injury to occur prior to the revelation of the cause.

Notably, Appellants' reliance on <u>J.H. France</u> is misplaced. Aside from the fact that <u>J.H. France</u> involves a different trigger of coverage theory, which will be discussed in Part III, the case does not stand for the proposition that manifestation takes place when both the existence of injury and its cause are reasonably ascertainable. In <u>J.H. France</u>, this Court held that manifestation for purposes of the multiple trigger theory of liability insurance coverage in the context of asbestos-related injury claims does not take place "until the time that increasing incapacitation results in manifestation as a recognizable disease." <u>J.H. France</u>, 626 A.2d at 507. To the extent <u>J.H. France</u> is relevant to a case

involving application of the first manifestation rule, it better supports Penn National's contention that manifestation happens when the injury, not the cause of injury, manifests in a way that can be ascertained by reasonable diligence. In J.H. France, manifestation of injury occurred when evidence of asbestos-related disease first surfaced, not when the injured party was capable of tracing his or her injury to its probable cause.

Finally, extending coverage under a policy of general liability insurance when the effects of injury first manifest, without requiring the cause of injury to be discoverable, poses three modest advantages. First, it better protects against injured parties insuring themselves for events which have already taken place. See Consulting Engineers, 710 A.2d at 88 (noting "the well-established rule that a person may not insure against an injury that has already occurred"). Delaying trigger of coverage until the cause of an injury is reasonably ascertainable would allow a tortfeasor with knowledge of his or her potential liability to shift this burden to an unwary insurance company. Second, it adds certainty and predictability to a trigger of coverage analysis. Identifying the effects of actual injury is simpler and less involved than tracing injury to its probable cause. Finally, in the event the insurer eventually becomes insolvent, the insured is more likely to obtain coverage as the policy will be triggered at an earlier date, when injury first manifests.[11]

---

[11] Moreover, implicit concerns of fairness and equity do not require that the injured party first discover both the injury and its cause before an injury is deemed to have manifested for purposes of triggering coverage under a policy of third party liability insurance. Whether coverage is triggered when injury manifests or when both injury and its cause becomes reasonably apparent should make little or no difference to the insured or the third party injured by the insured's conduct, except in the incidental case, like this one, when the insured happens to carry better coverage at a later date when the cause of injury becomes apparent. Although timing of discovery is critical to a plaintiff pursuing a tort claim due to the statute of limitations, in most cases timing of insurance coverage will (continued…)

Thus, we hold, consistent with the first manifestation rule articulated in D'Auria, that coverage is triggered under one of the Penn National policies when either bodily injury or property damage becomes reasonably apparent. See D'Auria, 507 A.2d at 861 (holding "[a]n occurrence happens when the injurious effects of the negligent act *first manifest themselves* in a way that would put a reasonable person on notice of injury") (emphasis in original). Application of the first manifestation rule herein appropriates the reasonable expectations of Penn National and LPH Plumbing at the time of their contracting. It ensures that LPH Plumbing, as insured, will receive coverage for liabilities arising from bodily injury and property damage that become reasonably apparent during the applicable policy period; and it ensures that Penn National, as insurer, will not answer for bodily injury or property damage that LPH Plumbing was aware of prior to the start of the policy period.

Turning to the facts of this case, we conclude that the record supports the trial court's finding that property damage, defined by the Penn National policies as physical injury to tangible property or loss of use of tangible property, first became reasonably apparent in April 2004. While Appellants dispute the exact array of maladies that manifested during the first policy period, the record is clear that as a result of the gray water contamination the dairy herd in April 2004 experienced a dramatic drop in milk production, and began suffering higher incidents of various dairy farm maladies such as

---

(…continued)
not be relevant to the injured party so long as the insured maintains coverage, given that the injured party has no way of knowing which year the insured carried greater coverage.

metabolic disorders, fevers, and ketosis.   R.R. 305a, 345a-46a.[12]   The significant drop in milk production in April 2004, which no party disputes, constitutes property damage under the Penn National policies, as it indicates the loss of use of tangible property. Moreover, if we assume that the drop in milk production does not fit the definition of property damage but consists of purely economic injury, as Appellants argue, the higher incidents of various metabolic disorders starting in April 2004, certainly constitute property damage in the form of physical injury to the dairy herd.

We therefore affirm the trial court's holding that the injurious effects of LPH Plumbing's negligent installation of the plumbing system first manifested in April 2004, when the dairy herd experienced a significant drop in milk production, in addition to higher incidents of various illnesses such as metabolic disorders, milk fevers, and ketosis.   The fact that Appellants did not discover the cause of the dairy herd's various maladies until March 2006, or that Appellants initially dismissed the maladies manifesting in April 2004 as incidental to normal dairy farm operations, has no bearing on our determination of which Penn National policy applies.   Relevant to our inquiry, the trial court found that property damage to Appellants' dairy herd became reasonably apparent in April 2004, which, in retrospect, we know was caused by LPH Plumbing's negligent installation of the plumbing system and the subsequent seepage of gray water into the dairy herd's

---

[12]   Appellants' own testimony at trial confirms that they experienced various health problems with the dairy herd in 2004, in addition to the unusual fluctuations in milk production which Appellants do not dispute.   See supra note 6.   We therefore accept the trial court's findings concerning the timing and nature of the property damage sustained by the dairy herd.   As the Superior Court admirably noted, it is not the role of an appellate court to reweigh the evidence.

freshwater drinking system. Coverage is therefore triggered under the Penn National policy in effect from July 1, 2003 to July 1, 2004, only.

III.

In the alternative, Appellants argue that the multiple trigger theory of liability insurance coverage adopted by this Court in J.H. France in the context of asbestos bodily injury claims applies to continuous, progressive property damage as occurred here, and thus triggers all of the Penn National policies at issue. We disagree. As our disposition of the first two issues establishes, the first manifestation rule serves as the appropriate trigger of coverage theory under the Penn National policies, triggering coverage under the Penn National policy in effect from July 1, 2003 to July 1, 2004, only. Notwithstanding, we will summarize and respond to Appellants' posited argument.

Appellants argue that this Court's holding and rationale in J.H. France controls for purposes of our interpretation and application of the Penn National policies. In J.H. France, this Court applied the multiple trigger theory of liability to determine whether bodily injuries caused by asbestos exposure triggered coverage under various occurrence-based general liability policies. J.H. France, 626 A.2d 502. Our decision to apply the multiple trigger theory of liability in J.H. France was predicated on the language of the policies at issue and the nature of the injuries giving rise to the insured's liability. Specifically, the policies defined "bodily injury" as "bodily injury, sickness or disease which occurs during the policy period," and defined an occurrence as "an accident, including continuous or repeated exposure to conditions, which result in bodily injury . . . neither expected nor intended" by the insured. Id. at 505. We observed that medical evidence concerning the etiology and pathogenesis of asbestos-related disease showed that bodily

injury occurred from the moment of exposure until the manifestation of a recognizable disease. Accordingly, we held that each insurer was jointly and severally liable for the insured's injuries if any of the following occurred while the insurer was at risk: exposure to asbestos, development of the pathology, or manifestation of the disease. Id. at 506.

Appellants note the similarities between the language of the Penn National policies and the policies at issue in J.H. France. Under both sets of policies, "bodily injury" is described in part as "bodily injury sickness or disease . . ." and an "occurrence" is defined as "an accident, including continuous or repeated exposure to [conditions] . . . ." Appellants further liken the property damage sustained by the dairy herd to the continuous, progressive bodily injury caused by exposure to asbestos fibers or other toxic tort scenarios. Just as this Court in J.H. France found that bodily injury, as defined by the relevant policies, occurred during exposure to asbestos, development of the pathology, and manifestation of disease, with each constituting separate triggers of coverage, Appellants would have us find that the continuous and progressive property damage sustained by the dairy herd triggered coverage under each Penn National policy in effect from the time the dairy herd first sustained harm in 2003 until their injuries manifested in 2006.

Appellants maintain that the Superior Court below erred in construing Consulting Engineers, which this Court affirmed on the basis of the opinion of the Superior Court, as an express refusal by this Court to extend the multiple trigger theory of liability adopted in J.H. France beyond asbestos or other toxic tort scenarios. First, Appellants dismiss as non-binding dicta the language and reasoning from the Superior Court's opinion in Consulting Engineers regarding the applicability to J.H. France. Moreover, echoing the

argument of Judge Bowes from her dissenting opinion in the case below, Appellants contend that Consulting Engineers merely stands for the proposition that the multiple trigger theory of liability does not apply to single-occurrence torts such as wrongful use of civil proceedings, which was at issue in that case. Finally, to the extent we agree that Consulting Engineers does hold that the multiple trigger theory never applies to instances of continuous, progressive property damage, Appellants maintain that this Court should disavow the holding as an incorrect statement of law.

Thus, Appellants urge this Court to announce the applicability of the multiple trigger theory of liability insurance coverage to cases involving "continuous, progressive property damage over successive policy periods," contending that this will align Pennsylvania jurisprudence with the weight of authority from other jurisdictions. Brief of Appellant at 30. Appellants cite cases from jurisdictions that applied the multiple trigger theory to coverage disputes involving continuous, progressive property damage. See e.g. Wisconsin Electric Power Co. v. California Union Ins. Co., 419 N.W.2d 255 (Wis. App. 1987) (holding that continuous property damage sustained by a dairy herd over a twelve year period, caused by a negligently installed power supply emitting stray voltage, warranted application of the continuous/multiple trigger principle of liability whereby each insurer on the risk during the twelve-year period was required to respond on a joint and several basis); Montrose Chemical Corp. v. Admiral Ins. Co., 913 P.2d 878 (Cal. 1995) (en banc) (applying the continuous/multiple trigger theory of liability insurance coverage within the context of continuous and progressive environmental damage claims); Spaulding Composites Co., Inc. v. Aetna Cas. & Sur. Co., 819 A.2d 410, 415 (N.J. 2005) (same). Appellants further assert that in Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98

F.3d 1440 (3d Cir. 1996), the Third Circuit extended the multiple trigger theory to continuous, progressive property damage, predicting that this Court would do likewise.

In response, Penn National contends that the trial court and Superior Court below properly rejected Appellants' argument that the multiple trigger theory from J.H. France should be extended to progressive, continuous property damage claims. According to Penn National, our holding in J.H. France constitutes a narrow exception to the general rule announced in D'Auria that an occurrence policy is triggered when damage first becomes reasonably apparent. Penn National maintains that we adopted the multiple trigger approach in J.H. France because of the unique etiology and pathogenesis of asbestos-related disease, noting our concern that insurance companies, facing countless future asbestos-related disease claims, would terminate coverage of manufacturers working with asbestos products during the decades-long latency period of asbestos-related disease, leaving claimants without coverage when the injuries eventually manifest. Because the property damage to Appellants' dairy herd was not concealed and undiscoverable for decades, Penn National contends that neither the science, reasoning, nor the public policy considerations that informed our decision in J.H. France apply to Appellants' claims against LPH Plumbing, and thus, this case does not warrant application of the multiple trigger theory for determining coverage under the Penn National policies.

Penn National further contends that if this Court were to extend application of the J.H. France multiple trigger theory to continuous, progressive property damage, it would be departing from established precedent on the issue. Penn National maintains in this regard that when this Court affirmed Consulting Engineers on the basis of the opinion of

the Superior Court, it adopted the reasoning of that court therein.   Thus, Penn National would have us follow the Superior Court's analysis in <u>Consulting Engineers</u>, and refuse to apply the multiple trigger theory outside of latent bodily injury disease cases, like asbestosis or mesothelioma.

Penn National further asserts that Appellants' reliance on the Third Circuit's decision in <u>Koppers</u>, and caselaw from other jurisdictions applying the continuous/multiple trigger theory to either asbestos or environmental damage claims lacks persuasive merit.   Penn National maintains that in <u>Koppers</u>, the applicability of the multiple trigger theory was not at issue, but rather, the case related to a different question involving joint and several liability for insurers whose policies were triggered by an indivisible loss caused by environmental property damage.   Moreover, Penn National contends that the caselaw from other jurisdictions applying the multiple trigger theory to continuous, progressive property damage claims fails to demonstrate, as Appellants assert, a growing weight of authority in favor of expanding its applicability outside the context of asbestos-related bodily injury claims.   Penn National professes that the caselaw cited by Appellants is distinguishable based upon differing policy language, factual dissimilarities, and state-specific methods for resolving insurance coverage trigger disputes.

Finally, Penn National maintains that even if we adopted and applied the multiple trigger theory of insurer liability to this case, Appellants are not entitled to relief.   If, as the trial court found, both exposure and manifestation of harm occurred within the first policy period, then only the first Penn National policy in effect from July 1, 2003 to July 1, 2004

would be triggered, regardless of whether we apply the first manifestation or multiple trigger theory of liability.

Whether the multiple trigger theory of liability insurance coverage adopted by this Court in J.H. France in the context of asbestos bodily injury claims applies to determine coverage under the Penn National policies for the continuous, progressive property damage sustained by the dairy herd is a question of law. As such, our standard or review is *de novo* and scope of review is plenary. Baumhammers, 938 A.2d at 290; Am. & Foreign Ins. Co., 2 A.3d at 532-33. For the reasons that follow, we decline to apply the multiple trigger theory of insurer liability to determine coverage under the Penn National policies.

A close reading of the language contained in the Penn National policies reveals that, consistent with the first manifestation approach, only the policy in effect when an occurrence first arises is answerable for the ensuing bodily injury or property damage. The Penn National policies provide coverage when an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," causes either "bodily injury" or "property damage" during the respective policy period. CGL policy at Section V, Subsection (13); R.R. 400a. Fairly read, this language can be given one of two meanings. First, apropos of the multiple trigger theory, it can be construed to mean that continuous, progressive property damage caused by a single occurrence but spanning multiple policy periods triggers coverage under each policy. Or, consistent with the first manifestation rule, it can be construed to mean that continuous, progressive property damage caused by a single occurrence only triggers coverage under the policy in effect when the occurrence first arises,

notwithstanding that the property damage continues or resumes after the end of the respective policy period. As we explain below, the latter interpretation better reflects the intent and effectuates the reasonable expectations of Penn National and its insured at the time of contracting.

When Section I, Subsection (1)(b) of the Penn National policies – stipulating that the respective policy applies when an "occurrence" causes "bodily injury" or "property damage" during the policy period – is read in <u>pari</u> <u>materia</u> with Section I, Subsection (1)(c) of the policy, it is evident that the first manifestation approach for determining coverage is the better construction. Section I, Subsection (1)(c) clarifies that "bodily injury" and "property damage" which occurs during the policy period "includes any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period," provided the insured has not received notice of the same. <u>See</u> <u>supra</u> note 5. If, as Appellants argue, a single "occurrence" could trigger coverage under multiple policy periods based on continuous, progressive bodily injury or property damage, then Subsection (1)(c) would be rendered largely irrelevant. By extending coverage under a policy triggered by an occurrence for any continuation, change or resumption of bodily injury or property damage after the end of the respective policy period, Section I, Subsection(1)(c) lends support to the interpretation that only the policy in effect when an occurrence first arises is answerable for the ensuing bodily injury or property damage.

Our analysis is further informed by the fact that since 1986, in Pennsylvania the first manifestation rule has served as the test for determining coverage under commercial general liability policies, with the lone exception of asbestos bodily injury claims. <u>See</u> <u>See</u> <u>D'Auria</u> 507 A.2d 857; <u>Consulting Engineers</u>, 710 A.2d 82; <u>Guaranty Nat. Ins. Co.</u>,

109 F.3d 156 (applying Pennsylvania law and following the first manifestation rule from D'Auria). When LPH Plumbing and Penn National drafted the Penn National policies, it is reasonable to believe that they intended to invoke the prevailing first manifestation rule with the requirement that property damage "[occur] during the policy period." It is unlikely that the parties would have intended or expected a single occurrence, albeit with property damage continuing past the end of the respective policy period, to trigger coverage under multiple consecutive policies. At the very least, they should have anticipated its application to the Penn National policies, and drafted around the first manifestation rule if they preferred a different trigger of coverage. Accordingly, the better position is to construe the Penn National policies as providing for coverage only under the policy or policies in effect at the time an occurrence first arises. As we explained supra, an occurrence first arises when bodily injury or property damage first manifests in a way that becomes reasonably apparent. See D'Auria, 507 A.2d at 861.

Appellants' argument that our holding and rationale for applying the multiple trigger theory in J.H. France should control for purposes of determining trigger of coverage under the Penn National policies is unavailing. Our decision in J.H. France to apply the multiple trigger theory within the context of asbestos bodily injury claims was predicated in large part on the special "etiology and pathogenesis of asbestos-related disease." J.H. France, 626 A.2d at 506. There we held that the various stages in the pathogenesis of asbestos and silica related diseases – namely, the exposure to asbestos or silica, the progression of the disease, and its eventual manifestation – each constituted "bodily injury" as defined by the insurance policies at issue in J.H. France. Id. Applying the

multiple trigger theory of liability, we "regard[ed] all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify…." Id. at 507.

In choosing to apply the multiple trigger theory of liability in J.H. France, we cited with approval the seminal decision Keene Corp. v. Ins. Co. of North America, 667 F.2d 1034 (D.C. Cir. 1981), which presents the prevailing rationale for utilizing the multiple trigger theory when confronted with asbestos bodily injury claims. In Keene Corp., the D.C. Circuit reasoned that because the existence and eventual manifestation of latent injury among those who had worked with or been exposed to asbestos/silica could be predicted with near certainty, application of the first manifestation rule for determining trigger of coverage would engender en masse cancellation of occurrence-based liability insurance policies by insurers seeking to limit their liability for asbestos bodily injury claims. Accordingly, to better effectuate the insured's reasonable expectations and to preserve the proper allocation of rights and obligations between insurer and insured, the D.C. Circuit in Keene Corp. held, per application of the multiple trigger theory, that both exposure to asbestos/silica and manifestation of the disease served as triggers of coverage. Id. at 1047.

The Superior Court's decision in Consulting Engineers, which this Court affirmed on the basis of the Superior Court's opinion, endorses the rationale set forth in Keene Corp. for utilizing the multiple trigger theory within the context of asbestos bodily injury

claims.[13]   Borrowing from the reasoning presented in Keene Corp. the Superior Court

explained:

> The "multiple trigger" theory is applied in latent disease cases, like asbestosis or mesothelioma, because such injuries may not manifest themselves until a considerable time after the initial exposure causing injury occurs.   The overriding concern in latent disease cases is that application of the D'Auria "first manifestation" rule would allow insurance companies to terminate coverage during the long latency period (of asbestosis); effectively shifting the burden of future claims away from the insurer to the insured (manufacturers of asbestos), even though the exposure causing injury occurred during periods of insurance coverage.

Keene Corp., 667 F.2d at 87.   Based upon this reasoning, the Superior Court declined to

apply the multiple trigger theory to determine coverage under various policies of CGL

insurance for injuries arising from the wrongful use of civil proceedings, as these injuries

did not lie dormant for extended periods prior to manifesting.   Id. 87-88.

The justification advanced in Keene Corp. and Consulting Engineers for utilizing

the multiple trigger theory is absent with respect to Appellants' action seeking coverage

under the Penn National policies.   Here, the damage sustained by Appellants' dairy

herd, occasioned by LPH Plumbing's negligent installation of the plumbing system, did

not lay dormant for an extended period.   The record indicates that damage to Appellants'

dairy herd first manifested in April 2004, less than a year after the dairy herd first began

---

[13]     The Superior Court's discussion of the multiple trigger theory of liability in Consulting Engineers was central to its trigger of coverage analysis in that case, and therefore carries precedential value given this Court's adoption of that court's opinion. See Commonwealth v. Tilghman, 673 A.2d 898, 904 (Pa. 1996) (holding that when this Court per curiam affirms on the basis of the lower court's opinion, it not only signals agreement with the result but also with the rationale employed in reaching its final disposition on matters essential to its holding).

ingesting the contaminated drinking water.[14]  Moreover, unlike asbestos bodily injury claims which insurers could predict with near certainty, there was no indication of probable injury to Appellants' dairy herd prior to manifestation that would cause Penn National to anticipate a future claim.  Accordingly, this case does not present the problematic scenario where a risk averse insurer takes steps to limit or terminate coverage, in anticipation of future claims that have not yet materialized but can be predicted with near certainty.

Thus, while the multiple trigger theory of liability appropriated the reasonable expectations of the insured in J.H. France, the circumstances of the damage to Appellants' dairy herd, coupled with the language of the Penn National policies does not warrant its application herein.  Our holding in J.H. France remains an exception to the general rule under Pennsylvania jurisprudence that the first manifestation rule governs a trigger of coverage analysis for policies containing standard CGL language.  We therefore find J.H. France distinguishable and decline to apply the multiple trigger theory of liability to determine coverage under the Penn National policies for the damages sustained by Appellants' dairy herd.

We further decline Appellants' invitation to align Pennsylvania jurisprudence with the Third Circuit and with what Appellants describe as the weight of authority from other jurisdictions by announcing the general applicability of the multiple trigger theory of liability insurance coverage to all cases involving "continuous, progressive property damage over successive policy periods."  Brief of Appellant at 30.  First, contrary to

---

[14]    Even if we agree with Appellants that the damage to their dairy herd manifested in 2006, then these injuries were latent, at the very most, for a three year period.

Appellants' assertion, the Third Circuit did not predict in Koppers Co., Inc. that this Court would extend upon our holding in J.H. France and apply the multiple trigger theory to continuous, progressive property damage cases. Koppers Co., Inc. addressed a different issue regarding joint and several liability of insurers whose policies were triggered by an indivisible loss. Id. at 1449-50. Moreover, when faced with the task of construing and applying insurance contract language, caselaw from other jurisdictions is generally inapposite, especially when there is Pennsylvania caselaw directly on point. As we have intimated above, the role that Pennsylvania caselaw plays in shaping the reasonable expectations of the parties to an insurance contract formed in Pennsylvania cannot be lightly disregarded.

Consistent with our analysis set forth above, we hold that only the Penn National policy in effect when damage to Appellants' dairy herd first manifested in April 2004 is answerable for the ensuing property damage. The judgment of the Superior Court is therefore affirmed.

Former Justice McCaffery did not participate in the decision of this case.

Mr. Chief Justice Castille and Mr. Justice Eakin join the opinion.

Mr. Justice Saylor files a dissenting opinion.

Madame Justice Todd dissents as she would dismiss the appeal as improvidently granted.