**[J-27A-2024 and J-27B-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| TIMOTHY A. UNGAREAN, DMD D/B/A SMILE SAVERS DENTISTRY, PC, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, | : No. 11 WAP 2023<br>:<br>: Appeal from the Order of the<br>: Superior Court entered<br>: November 30, 2022, at<br>: No. 490 WDA 2021, affirming |
| Appellee | : the Order of the Court of<br>: Common Pleas of Allegheny<br>: County entered March 26, 2021, |
| v. | : at No. GD-20-006544.<br>:<br>: ARGUED: April 10, 2024 |
| CNA AND VALLEY FORGE INSURANCE COMPANY, | :<br>:<br>: |
| Appellants | : |
| TIMOTHY A. UNGAREAN, DMD D/B/A SMILE SAVERS DENTISTRY, PC, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, | : No. 12 WAP 2023<br>:<br>: Appeal from the Order of the<br>: Superior Court entered<br>: November 30, 2022, at<br>: No. 948 WDA 2021, affirming |
| Appellee | : the Order of the Court of<br>: Common Pleas of Allegheny<br>: County entered March 26, 2021, |
| v. | : at No. GD-20-006544.<br>:<br>: ARGUED: April 10, 2024 |
| CNA AND VALLEY FORGE INSURANCE COMPANY, | :<br>:<br>: |
| Appellants | : |

**<u>OPINION</u>**

**JUSTICE BROBSON**                           **DECIDED: SEPTEMBER 26, 2024**

In this discretionary appeal, we must decide whether Timothy A. Ungarean, DMD D/B/A Smile Savers Dentistry, PC (Ungarean), individually and on behalf of a class of similarly situated persons, is entitled to coverage under his commercial property insurance policy with CNA and Valley Forge Insurance Company (CNA and CNA Policy) for financial losses sustained due to the COVID-19 pandemic and Pennsylvania's non-essential business shutdown in March 2020. After careful review, we conclude that Ungarean is not entitled to insurance coverage under the plain and unambiguous language of the CNA Policy because his business properties covered thereunder did not sustain any physical loss or damage. Accordingly, we reverse the judgment of the Superior Court and remand to the Superior Court with instructions to remand to the trial court to enter summary judgment in CNA's favor.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ungarean owns and operates Smile Savers Dentistry, PC, a dental practice with offices in Pittsburgh and Aliquippa (Covered Properties). Ungarean purchased a commercial property insurance policy from CNA that provided coverage for certain business- and property-related losses of his dental practice for the period between April 1, 2019, and April 1, 2020. In March 2020, Governor Tom Wolf (Governor) issued several orders related to the COVID-19 pandemic directing, *inter alia*, all non-essential businesses to close until further notice. Except for emergency dental procedures, Ungarean closed his dental practice, which he claims caused a drastic loss in income to his business, the furloughing of employees, and other harmful consequences. Ungarean filed a claim with CNA pursuant to the CNA Policy to recoup those losses. CNA denied coverage on the basis that the Covered Properties did not suffer any physical damage or harm.

A. Trial Court Proceedings

Ungarean subsequently filed a class action complaint under the Declaratory Judgments Act[1] in the Court of Common Pleas of Allegheny County (trial court), seeking a declaration that the CNA Policy—through the Business Income and Extra Expense Endorsement and the Civil Authority Endorsement—covers his pandemic-related business losses. Ungarean filed a motion for summary judgment, and CNA responded by filing a cross-motion for summary judgment. Following argument, the trial court issued an order granting Ungarean's motion for summary judgment and denying CNA's cross-motion for summary judgment.

In an accompanying memorandum opinion,[2] the trial court first considered whether Ungarean was entitled to coverage under the Business Income and Extra Expense Endorsement of the CNA Policy, which requires Ungarean to show "direct physical loss of or damage to" the Covered Properties for coverage to apply. To that end, Ungarean contended that "direct physical loss of . . . property" is not limited to the physical alteration of or damage to the Covered Properties but also included the loss of *use* of the Covered Properties. Ungarean further asserted that, because that interpretation was reasonable,

---

[1] 42 Pa. C.S. §§ 7531-7541.

[2] Prior to analyzing the relevant provisions of the CNA Policy, the trial court first recognized that the "interpretation of an insurance contract is a matter of law, which may be decided . . . on summary judgment." (Trial Ct. Op. at 7-8 (citing *Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1231 (Pa. Super. 2002), *aff'd*, 847 A.2d 1274 (Pa. 2004)).) Further, the trial court noted that Ungarean bore the initial burden to demonstrate that his claim fell within the CNA Policy's coverage provisions and, upon a satisfactory showing, that burden would then shift to CNA to prove "the applicability of any exclusions or limitations on coverage." (*Id.* at 8 (citing *State Farm Fire & Cas. Co. v. Est. of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law), and quoting *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (same)).) Lastly, the trial court observed that if the CNA Policy's terms are subject to more than one reasonable interpretation, it must find the CNA Policy ambiguous and construe any ambiguity in favor of Ungarean and against CNA as the drafter of the CNA Policy. (*Id.* (citing/quoting, *inter alia*, *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020)).)

the trial court was required to find in his favor. In response, and in line with its initial denial of Ungarean's coverage claim, CNA generally submitted that "direct physical loss of or damage to" the Covered Properties required the physical alteration of or harm thereto.

In its analysis,[3] the trial court focused on the fact that the "two [relevant] phrases are separated in the [CNA Policy] by the disjunctive 'or'"—*i.e.*, "direct physical loss of *or* damage to" property—and it concluded, therefore, that those terms must have different meanings. (Trial Ct. Op. at 12.) Lacking definitions in the CNA Policy for the terms "direct," "physical," "damage," and "loss," the trial court applied dictionary definitions to conclude that Ungarean's interpretation was persuasive:

> Based upon [those dictionary definitions], it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, *i.e.*, destruction and ruin. Applying this definition gives the term "loss" meaning that is different from the term "damage." Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to [the Covered Properties] (complete or partial), this [c]ourt conclude[s] that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.
>
> In reaching [this] conclusion, this [c]ourt also consider[s] the meaning and impact of the terms "direct" and "physical." Ultimately, this [c]ourt determine[s] that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss." As noted previously, "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"

---

[3] Although the trial court did not explicitly state that it found the CNA Policy's critical phrase "direct physical loss of or damage to" ambiguous, its analysis clearly implies that it concluded that the phrase is subject to more than one reasonable interpretation as stated by the parties.

and "physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ." Based upon these definitions it is certainly reasonable to conclude that [Ungarean] could suffer "direct" and "physical" loss of use of [the Covered Properties] absent any harm to property.

(*Id.* at 13-14 (some alterations in original) (footnotes omitted).)

As applied to Ungarean, the trial court opined that his loss of use of the Covered Properties was both "direct" and "physical" because "[t]he spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which [Ungarean] materially utilized [the Covered Properties] and physical space." (*Id.* at 14.) Thus, contrary to CNA's contention that Ungarean merely suffered economic losses, the trial court reasoned that any economic losses were secondary to Ungarean's physical loss of use of the Covered Properties.

The trial court also rejected CNA's contention that the definition of "period of restoration" in the CNA Policy indicated that tangible damage is required for Business Income and Extra Expense coverage. (*See* CNA Policy, Business Income and Extra Expense Endorsement ("We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'").) Although conceding that the definition of "period of restoration" ends on the date when the premises "should be repaired, rebuilt or replaced with reasonable speed and similar quality," the trial court noted that the COVID-19 pandemic required numerous physical changes to business properties across the Commonwealth, including, but not limited to, "the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems." (Trial Ct. Op. at 15.) "These changes," the trial court reasoned, "would undoubt[ed]ly constitute 'repairs' or 'rebuilding' of property." (*Id.* at 15-16.)

Moreover, the trial court emphasized that whether Ungarean actually completed those changes was irrelevant because the "period of restoration" does not *require* that changes to the Covered Properties be made; rather, the trial court opined that it merely imposes a time limit on available coverage, which would end whenever such changes were complete:

> To put this another way, the "period of restoration" ends when [Ungarean's] business is once again operating at normal capacity, or reasonably could be operating at normal capacity. The "period of restoration" does not somehow redefine or place further substantive limits on types of available coverage. [CNA] cannot avoid providing coverage that is otherwise available simply because the end point with regard to the "period of restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19 pandemic.

(*Id.* at 16.) Accordingly, the trial court concluded that Ungarean's interpretation of the CNA Policy was reasonable and established a right to coverage under the Business Income and Extra Expense Endorsement.

The trial court next considered whether Ungarean was entitled to coverage under the Civil Authority Endorsement of the CNA Policy, which provides, in pertinent part:

> When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by *action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property* at locations, other than described premises, caused by or resulting from a *Covered Cause of Loss*.

(*See id.* at 17 (quoting CNA Policy, Civil Authority Endorsement).) CNA contended that the provision did not apply because the Governor's order did not limit Ungarean's access to the Covered Properties *entirely* because Ungarean was still able to conduct emergency procedures.

First, the trial court applied its same analysis concerning the Business Income and Extra Expense Endorsement to conclude that Ungarean had established "direct physical loss of . . . property" as expressed in the Civil Authority Endorsement. It then rejected

CNA's contention concerning prohibited access and concluded that the Civil Authority Endorsement likewise afforded Ungarean coverage. Although acknowledging that Ungarean's access was not entirely prohibited from the Covered Properties, the trial court reasoned that "an action of civil authority effectively prevented, or forbade by authority, citizens of the Commonwealth from accessing [Ungarean's] business in any meaningful way for normal, non[-]emergency procedures; procedures that likely [yield] a significant portion of [Ungarean's] business income." (*Id.* at 19.)

Accordingly, having concluded that Ungarean was entitled to coverage under the Business Income and Extra Expense and Civil Authority Endorsements of the CNA Policy, the trial court turned to whether CNA had demonstrated "the applicability of any exclusions or limitations on coverage." (*Id.* at 21 (quoting *Koppers Co.*, 98 F.3d at 1446).) To that end, CNA sought to deny Ungarean coverage under the CNA Policy based on the following exclusions: (1) Contamination Exclusion; (2) Fungi, Wet Rot, Dry Rot, and Microbes Exclusion (Microbe Exclusion); (3) Consequential Loss Exclusion; (4) Acts or Decisions Exclusion; and (5) Ordinance or Law Exclusion. The trial court, however, concluded that none of the exclusions applied.

As to the Contamination Exclusion, the trial court observed that the CNA Policy provides that CNA "will not pay for loss or damage caused by or resulting from . . . [c]ontamination by other than 'pollutants.'" (*Id.* (quoting CNA Policy ¶ B.2.d.(8)).) Absent a CNA Policy definition of "contamination," the trial court again applied a dictionary meaning to conclude that the "contamination exclusion only applies, in the broadest sense, when something external comes into contact with an object, *i.e.*, property, and destroys the object's purity." (*Id.* at 22.) Given that COVID-19 spreads almost entirely via person-to-person contact and not through the contamination of property, the trial court concluded that COVID-19 was "not clearly and unambiguously encompassed by the

[C]ontamination [E]xclusion" and that CNA, therefore, "failed to show that the [C]ontamination [E]xclusion prevents coverage in this instance." (*Id.* at 22-24.)

Turning to the Microbe Exclusion, the trial court observed that the CNA Policy provides that CNA will not pay for the "[p]resence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes." (*Id.* at 24 (quoting CNA Policy, Microbe Exclusion).) CNA contended that COVID-19 is excluded under that provision because viruses fall within the CNA Policy's definition of "microbes." The trial court observed that a "microbe" is defined as

> any non-fungal microorganism or non-fungal, colony-form organism that causes infection or disease. "Microbe" includes any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of microbes.

(*Id.* at 24 (quoting CNA Policy, Microbe Exclusion).) In considering whether COVID-19 falls within that definition, the trial court found it necessary to further define "microorganism," "organism," and "virus:"

> Merriam-Webster defines "microorganism" as "an organism (such as a bacterium or protozoan) of microscopic or ultramicroscopic size." Merriam-Webster defines "organism" in relevant part as "an individual constituted to carry on the activities of life by means of parts or organs more or less separate in function but mutually dependent [and/or] *a living being*."
>
> In contrast, Merriam-Webster defines a virus as "any large group of submicroscopic infectious agents that are usually regarded as *nonliving* extremely complex molecules . . . that are capable of growth and multiplication only in living cells, and that cause various important diseases in humans, animals, and plants." In fact, "outside a host viruses are dormant . . . [they] have none of the traditional trappings of life [and their] zombielike existence . . . makes them easy to catch and hard to kill."

(*Id.* at 25-26 (emphasis in original) (footnotes omitted) (citations omitted).)

The trial court then distinguished between the living and non-living aspects of organisms and viruses, respectively, to conclude that the term "microbe" as defined by the CNA Policy does not include viruses. Notably, in so doing, the trial court conceded that it is not an "expert in the complex intricacies of science, nor [did] it presume to wholly

realize the subtle considerations by which trained scientists define and classify things in the natural world." (*Id.* at 26.) But, the trial court reasoned that, on a motion for summary judgment, it merely needed to determine whether the CNA Policy provisions are subject to more than one reasonable interpretation. If so, the trial court opined, the provisions of the CNA Policy are ambiguous, and Pennsylvania law directed that it hold in favor of Ungarean. Because it was permitted to apply dictionary definitions in order to construe the CNA Policy's provisions, the trial court defended its distinction between living microscopic organisms and non-living viruses to deny the applicability of this exclusion despite recognizing that there may be another reasonable interpretation to the contrary.

The trial court next considered the Consequential Loss Exclusion, which provides that CNA "will not pay for loss or damage caused by or resulting from . . . [d]elay, loss of use or loss of market." (*Id.* at 27-28 (quoting CNA Policy ¶ B.2.b).) CNA argued that, even if Ungarean had shown a basis for coverage under the CNA Policy, the Consequential Loss Exclusion clearly and unambiguously excludes any coverage Ungarean may be entitled to receive. The trial court agreed that the provision was clear and unambiguous, but it reasoned that to enforce the Consequential Loss Exclusion would mean vitiating the Business Income and Extra Expense and Civil Authority Endorsements in their entirety:

> [E]ven if this [c]ourt accepted [CNA's] more limited interpretation of the scope of coverage and the phrase "direct physical loss of or damage to property" to only include coverage in instances where [the Covered Properties were] physically altered or damaged, this [E]xclusion would effectively eliminate coverage for any kind of loss and/or damage caused by any covered peril, which closes [Ungarean's] business while it is being repaired.

(*Id.* at 28.) Accordingly, to avoid making the Business Income and Extra Expense and Civil Authority Endorsements "illusory" and to give the CNA Policy its full and intended

effect, the trial court concluded that the Consequential Loss Exclusion did not prevent coverage.

Finally, the trial court assessed the Acts or Decisions and the Ordinance or Law Exclusions. The Acts or Decisions Exclusion provides that CNA will not pay for "Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body." (*Id.* at 29 (quoting CNA Policy ¶ B.3.b).) The Ordinance or Law Exclusion provides that CNA will not pay for loss or damage due to:

(1) The enforcement of any ordinance or law:

(a) Regulating the construction, use or repair of any property; or

(b) Requiring the tearing down of any property, including the cost of removing debris.

(2) This exclusion applies whether the loss results from:

(a) An ordinance or law that is enforced even if the property has not been damaged; or

(b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

(*Id.* at 29 (quoting CNA Policy ¶ B.1.a).) CNA contended that the loss at issue occurred solely due to the Governor's order shuttering Ungarean's business, thereby excluding coverage under these exclusions. The trial court disagreed, however, specifically noting that Ungarean asserted in his complaint that he suffered a loss in relation to both the COVID-19 pandemic and the actions of the government in response thereto. Further, the trial court opined that the Governor's order only came into consideration in the context of Ungarean's claim for coverage under the Civil Authority Endorsement—*i.e.*, by an act of an authority—and, like the Consequential Loss Exclusion, to enforce the Acts or Decisions or Ordinance or Law Exclusions would make the Civil Authority Endorsement illusory. Thus, it declined to enforce those exclusions.

In sum, the trial court concluded that Ungarean's interpretations of the CNA Policy and its exclusions were, at the very least, reasonable, and that CNA had failed to demonstrate that the CNA Policy endorsements and exclusions clearly and unambiguously prevented coverage. For those reasons, it granted Ungarean's motion for summary judgment and denied CNA's cross-motion for summary judgment.

### B. Superior Court Proceedings

*i. Majority Opinion*

The Superior Court affirmed in a divided, precedential opinion. *Ungarean v. CNA*, 286 A.3d 353 (Pa. Super. 2022) (en banc). At the outset of its opinion, after setting forth a short factual and procedural history, the Superior Court explained:

> We are in full agreement with the [trial] court's conclusions. We are also in full agreement with the [trial] court's reasoning in support of those conclusions. Therefore, based primarily on the trial court's thoughtful opinion, we affirm the [trial] court's order granting summary judgment and declaring that coverage is owed to Ungarean for his COVID-related business losses under the specific terms of the CNA Policy.

*Ungarean*, 286 A.3d at 356 (footnote omitted). Specifically, the Superior Court agreed with the trial court that "direct physical loss of or damage to the property" is ambiguous, that the disjunctive "or" indicates a separate meaning of "loss" and "damage," and that Ungarean's interpretation of the CNA Policy was reasonable and, therefore, controlling. The Superior Court also rejected CNA's contention that Ungarean's interpretation of the CNA Policy writes out the terms "direct" and "physical," again agreeing with the trial court's rationale that COVID-19 and the Governor's order "had a close logical, causal and/or consequential relationship to the ways in which [Ungarean] materially utilized [the Covered Properties] and physical space." *Id.* at 360 (one alteration in original) (quoting Trial Ct. Op. at 13-14). The Superior Court similarly concluded that, although discussing physical repairs, rebuilding, or replacement, the "period of restoration" provision is "most reasonably construed as [a] time limit[] for coverage, and [it does] not otherwise alter the

definition of 'physical loss or damage.'" *Id.* at 361 (quoting Trial Ct. Op. at 15). Finally, because Ungarean had established a "direct physical loss of or damage to" his Covered Properties, the Superior Court concluded that the Civil Authority Endorsement applied to provide Ungarean coverage.

CNA also reasserted that, in the event the CNA Policy and its endorsements afforded Ungarean coverage, the relevant exclusions, nevertheless, applied. The Superior Court's analysis differed from the trial court on this issue, but it ultimately reached the same conclusion that the exclusions did not prevent coverage. First, the Superior Court held that four of the categories of exclusions CNA relied upon—the Contamination, Microbe, Acts or Decisions, and Ordinance or Law Exclusions—were inapplicable. In so doing, the Superior Court observed that, to obtain coverage under the Business Income and Extra Expense Endorsement, the loss or damage must also constitute a "Covered Cause of Loss," which the Superior Court noted is defined as "RISKS OF DIRECT PHYSICAL LOSS unless the loss is . . . [e]xcluded in section B. EXCLUSIONS." *Id.* at 361-62 (quoting CNA Policy ¶ A.3). Although recognizing that the definition of "Covered Cause of Loss" broadly referenced the entire exclusions provision of the CNA Policy, the Superior Court pointed out that the CNA Policy provided Ungarean two types of property insurance—*i.e.*, Businessowners Covered Property insurance and Business Income and Extra Expense insurance—and that Ungarean only sought coverage under the latter.

The Superior Court then turned to paragraph B.4 of the CNA Policy, titled "Business Income and Extra Expense Exclusions," which provides:

a. We will not pay for:

(1) Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

b. *Any other consequential loss.*

*Id.* at 363-64 (emphasis added) (quoting CNA Policy ¶ B.4). Finding some ambiguity in this apparent conflict of the exclusions in the CNA Policy, the Superior Court interpreted paragraph B.4 to limit the exclusions applicable to Business Income and Extra Expense claims to "[a]ny other consequential loss"—*i.e.*, the Consequential Loss Exclusion. The Superior Court then proceeded to agree with the trial court that to apply the Consequential Loss Exclusion in paragraph B.4 of the CNA Policy would "necessarily vitiate Business Income and Extra Expense coverage *in its entirety*." *Id.* at 364 (emphasis in original) (citing Trial Ct. Op. at 28). Thus, the Superior Court opined that it could not "conclude that the [E]xclusion for [C]onsequential [L]oss under the 'Business Income and Extra Expense Exclusions' is applicable so as to prevent coverage."[4] *Id.* Accordingly, the Superior Court affirmed the trial court's order.

### ii. Dissenting Opinion

Judge Stabile filed a dissenting opinion in which President Judge Emeritus Bender and Judges Bowes and King joined. Judge Stabile disagreed with the majority's "strained construct" of the operative phrase "direct physical loss or damage to property," reasoning that its interpretation violated the contract interpretation principle that individual contract terms should not be read in isolation. *Id.* at 386 (Stabile, J., dissenting). Rather, when

---

[4] In addition, the Superior Court pointed out that, even if the Contamination, Microbe, Acts or Decisions, or Ordinance or Law Exclusions applied, the Superior Court would have agreed with the trial court that none of those exclusions prevented coverage, reasoning so on grounds similar to or in line with the trial court. *See Ungarean*, 286 A.3d at 364-67.

read in context with the CNA Policy as a whole, Judge Stabile insisted that a "claim for lost business income and extra expenses only will be covered if the property sustains a tangible loss or damage that causes a suspension of business activities."  *Id.* at 388.  In support, Judge Stabile first referenced precedent from a number of other jurisdictions to highlight that "[t]he [m]ajority decision now places Pennsylvania as an outlier from the near unanimous conclusions reached by all state and federal courts to have considered the meaning of substantially similar language."  *Id.* at 386; *see also id.* at 389 (citing, *inter alia*, *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (holding that presence of asbestos does not constitute "physical loss or damage" unless it renders structure "uninhabitable and unusable")).

As to the relevant language of the CNA Policy, Judge Stabile found the majority's disjunctive argument "unavailing:"

> According to the [m]ajority's reading of "direct physical loss of *or* damage to [property]," the phrases on either side of the word "or" must mean something different.  Indeed, they do, as is evident from the period of restoration clause (and the extra expense clause, quoted above, which also ties itself to the period of restoration).  The period of restoration is the time period necessary to "repair, replace, or rebuild" any part of the covered property that had been "damaged or destroyed."  Thus, where there is a "physical loss"—*i.e.*[,] total loss or destruction of covered property—the period of restoration is the time necessary to rebuild or replace it.  Where there is partial "damage to" covered property the period of restoration is the time necessary to make repairs.  Thus, the appropriate, and by far the most reasonable, distinction between "physical loss" and "damage" is to read the former as applying in cases of total loss and the latter as applying in cases of partial damage.  The terms "repair, replace, or rebuild" make sense only in the case of physical damage to or physical destruction (loss) of the property.  They make no sense in a case of pure economic loss.

*Id.* at 392 (emphasis in original).  Thus, Judge Stabile rejected the "time limit" interpretation advanced by the trial court and the majority and emphasized that there was no period of restoration at issue in this case.  For those reasons, Judge Stabile also found that the Civil Authority Endorsement did not apply and that it was unnecessary to consider

any of the exclusions. Accordingly, Judge Stabile would have reversed the trial court and entered judgment in favor of CNA.

## II. ISSUES

CNA filed a petition seeking this Court's discretionary review, which we granted to consider the following issues:

(1) Did the Superior Court err in its decision affirming the trial court's opinion concluding that . . . Ungarean . . . is entitled to Business Income, Extra Expense and Civil Authority coverage under the policy issued by [CNA] as a result of the COVID-19 pandemic and associated orders issued by Governor Wolf, where the policy only provides coverage following "direct physical loss of or damage to" property and neither the relevant government orders nor the COVID-19 pandemic caused a physical alteration to property?

(2) Did the Superior Court err in its decision affirming the trial court's opinion concluding that . . . Ungarean . . . is entitled to Civil Authority coverage under the policy issued by [CNA] as a result of the COVID-19 pandemic and associated orders issued by Governor Wolf, where the policy provides such coverage only following an action by a civil authority that was issued "due to" physical loss of or damage to property and "prohibit[s] access" to a policyholder's premises?

(3) Did the Superior Court err in its decision affirming the trial court's opinion concluding that the Contamination; Consequential Loss; . . . Microbes; Acts or Decisions; and Ordinance or Law [E]xclusions in the [CNA] [P]olicy . . . did not bar coverage for . . . Ungarean['s] . . . alleged losses related to the COVID-19 pandemic and associated orders issued by Governor Wolf?

*Ungarean v. CNA*, 301 A.3d 862 (Pa. 2023) (one alteration in original).

To resolve these issues, "we must apply general principles of contract interpretation, as, at base, an insurance policy is nothing more than a contract between an insurer and an insured." *Gallagher v. GEICO Indem. Co.*, 201 A.3d 131, 137 (Pa. 2019). "The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *401 Fourth St., Inc. v. Invs. Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). "[T]he language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety." *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014). Where a policy's provisions are unambiguous,

"a court is required to give effect to that language." *401 Fourth St.*, 879 A.2d at 455. "Where a provision of a policy is ambiguous the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (quoting *Gene & Harvey Builders, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986)). Ambiguity exists in a contract where its language "is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). This Court will not "distort the meaning of the language or resort to a strained contrivance," however, "in order to find an ambiguity." *Madison*, 735 A.2d at 106.

It is further notable that this matter arises from relief the trial court afforded under the Declaratory Judgments Act. "In reviewing a declaratory judgment, we are limited to determining whether the trial court committed a clear abuse of discretion or committed an error of law." *Vanderhoff v. Harleysville Ins. Co.*, 997 A.2d 328, 332 (Pa. 2010). "The question of whether summary judgment is warranted is one of law, and thus our standard of review is de novo and our scope of review is plenary." *City of Philadelphia v. Cumberland Cnty. Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013). "Summary judgment may be entered only where the record demonstrates that there remain no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *Id.* (citing *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1182 (Pa. 2010)).

To reiterate, the Business Income and Extra Expense Endorsement of the CNA Policy provides, in pertinent part:

1. Business Income

   . . . .

   b. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by *direct physical loss of or damage to property* at the described premises. *The loss or damage must be caused by or result from a Covered Cause of Loss.*

   . . . .

2. Extra Expense

   a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no *direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.*

   b. We will pay Extra Expense . . . to:

   (1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

   (2) Minimize the "suspension" of business if you cannot continue "operations."

---

[5] American Property Casualty Insurance Association, National Association of Mutual Insurance Companies, Insurance of Federation of Pennsylvania, Pennsylvania Association of Mutual Insurance Companies, and Philadelphia Indemnity Insurance Company (Insurance Groups) filed an amicus brief in support of CNA, wherein the Insurance Groups claim that the Superior Court's interpretation of the CNA Policy is contrary to the nature and purpose of commercial property insurance, harms Pennsylvania's insurance market, and is an incorrect interpretation of the CNA Policy language. (*See* Insurance Groups Amicus Br. at 3-18.) United Policyholders, Penn Entertainment, Inc. f/k/a Penn National Gaming, Inc., Boscov's Department Store, LLC, Shaner Group, Eat'n Park Hospitality Group, Inc., Allegheny Health Network, and Walters & Mason Retail, Inc., filed several amicus briefs in support of Ungarean, wherein those *amici* generally contend that the courts below properly interpreted the CNA Policy.

(CNA Policy, Business Income and Extra Expense Endorsements (emphasis added).) The Civil Authority Endorsement of the CNA Policy provides coverage for an "action of [a] civil authority that prohibits access to the described premises" as a result of "direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss." (CNA Policy, Civil Authority Endorsement.) The CNA Policy provides the following definitions:

"Covered Causes of Loss"

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in section B. EXCLUSIONS;

b. Limited in paragraph A.4 Limitations; or

c. Excluded or limited by other provisions of this [P]olicy.

"Suspension" means:

a. The partial or complete cessation of your business activities; or

b. That a part or all of the described premises is rendered untenable.

"Period of restoration" means the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location,

"Period of restoration" does not include any increased period required due to the enforcement of any law that:

(a) Regulates the construction, use or repair, or requires the tearing down of any property; or

(b) Regulates the prevention, control, repair, clean-up or restoration of environmental damage.

The expiration date of this [P]olicy will not cut short the "period of restoration."

(CNA Policy, ¶¶ A.3, G.20, 29.)

CNA claims that the Superior Court erred in its interpretation of the phrase "direct physical loss of or damage to property" in the CNA Policy. Specifically, CNA emphasizes that, "[u]nder the unambiguous meaning of 'physical' loss or damage," a *physical* alteration or deprivation to the subject property is required. (CNA Br. at 18.) CNA insists that the loss of use of the Covered Properties' intended business purpose as a result of Governor Wolf's COVID-19 non-essential business shutdown is insufficient under the CNA Policy to afford Ungarean coverage. That interpretation, CNA emphasizes, also comports with the "period of restoration" language in the Business Income and Extra Expense Endorsement of the CNA Policy, which is defined as the time it takes to repair, rebuild, and replace the lost or damaged property. Because there is nothing to repair, rebuild, or replace in the absence of a physical alteration to the subject property, CNA claims that providing coverage in the absence of physical harm or damage would render the "period of restoration" language superfluous.

CNA also insists that Ungarean failed to present any evidence of "physical" damage to the Covered Properties because COVID-19 was never on Ungarean's premises to render the Covered Properties unusable, "uninhabitable or useless," nor did the Covered Properties require remediation because COVID-19 can be "wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own." (*Id.* at 21 (quoting *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 335 (7th Cir. 2021)).) CNA also asserts that the general spread of COVID-19 in the community failed to have any "physical" impact upon the Covered Properties because, "[a]t all times, Ungarean's property could be 'used or inhabited, just not in the way [Ungarean] would have liked.'" (*Id.* at 22 (quoting *Wilson v. USI Ins. Servs. LLC*, 57 F.4th 131, 142-43 (3d Cir. 2023)).) By way of further support, CNA references *Wilson*, a decision of the Third Circuit that reached the result that CNA sets forth, as well as "numerous other courts" that

reached the same conclusion. (*Id.* (citing, *inter alia*, *MacMiles, LLC v. Erie Ins. Exch.*, 286 A.3d 331 (Pa. Super. 2022), *appeal granted*, 301 A.3d 862 (Pa. 2023)).)

Ungarean, on the other hand, insists that the trial court and Superior Court properly interpreted the CNA Policy to afford him coverage, reiterating that the disjunctive "or" in the CNA Policy means that "loss of" and "damage to" property must have different meanings. (Ungarean's Br. at 17-18; *see also* CNA Policy, Business Income and Extra Expense Endorsement).) Because Ungarean physically lost the ability to use the Covered Properties, Ungarean claims he is entitled to coverage. In other words, contrary to CNA's interpretation, physical damage to the Covered Properties was not required for coverage under the CNA Policy. In support of that interpretation, Ungarean insists that the CNA Policy is ambiguous because it is susceptible to two reasonable interpretations— *i.e.*, that of CNA and that of Ungarean. As a result, Ungarean claims that this Court is required to resolve that ambiguity in Ungarean's favor as the insured. Indeed, Ungarean explains that an insurer's interpretation of an insurance policy should not be adopted merely because "its interpretation is more reasonable than the insured's interpretation. Otherwise, one would be resolving the ambiguity in favor of the insurer . . . ." (*Id.* at 21 (quoting Allan D. Windt, *Insurance Claims and Disputes*, 6th ed. § 6.2 at 6-60 to 6-62 (2013 & 2020 Supp.)).) Accordingly, because his interpretation of the CNA Policy is reasonable, Ungarean insists that we rule in his favor.

As explained, for coverage to apply under the Business Income and Extra Expense Endorsements of the CNA Policy, there must be a "direct physical loss of or damage to" the subject property. The terms "physical," "loss," and "damage" are not defined in the CNA Policy. Relevant dictionary definitions of "physical" include: "Of, relating to, or involving material things; pertaining to real, tangible objects;" and "having material existence: perceptible especially through the senses and subject to the laws of nature."

*Physical*, BLACK'S LAW DICTIONARY 1384 (12th ed. 2024); *Physical*, MERRIAM WEBSTER UNABRIDGED DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/physical?src=search-dict-box (last visited Sept. 24, 2024). Relevant dictionary definitions of "loss" include: "An undesirable outcome of a risk; the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way;" and "the partial or complete deterioration or absence of a physical capability or function." *Loss*, BLACK'S LAW DICTIONARY 1129 (12th ed. 2024); *Loss*, MERRIAM WEBSTER UNABRIDGED DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/loss (last visited Sept. 24, 2024). And relevant dictionary definitions of "damage" include: "Of, relating to, or involving monetary compensation for loss or injury to . . . property;" and "[l]oss or injury to . . . property; esp[ecially], physical harm that is done to something . . . ." *Damage*, BLACK'S LAW DICTIONARY 488 (12th ed. 2024).

With those definitions, the only reasonable interpretation of the operative phrase "direct physical loss of or damage to property" in the CNA Policy becomes clear: There must be either (1) a physical disappearance, partial or complete deterioration, or absence of a physical capability or function of the property (loss), or (2) a *physical* harm or injury to the property (damage). In other words, a *physical* alteration to the subject property is a threshold requirement for coverage to apply under the CNA Policy. This interpretation is further supported by the "period of restoration" language in the Business Income and Extra Expense Endorsement. Specifically, the Business Income section of that Endorsement provides that CNA will cover the loss of income "due to the necessary 'suspension' of your 'operations' during the 'period of restoration'" as a result of "physical loss of or damage to" the subject property. (CNA Policy, Business Income and Extra Expense Endorsement ¶ 1.b.) The Extra Expense section similarly provides that "Extra

Expense means reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred" absent a "physical loss of or damage to" the subject property. (CNA Policy, Business Income and Extra Expense Endorsement ¶ 2.a.)

Thus, for coverage to apply under the Business Income or Extra Expense Endorsement, there must be a suspension of operations due to a direct physical loss of or damage to the subject property and the loss of income during a "period of restoration." "Period of restoration" is defined as the period required to "repair[], rebuil[d] or replace[]" the subject property or when "business is resumed at a *new* permanent location." (CNA Policy, Definitions, "period of restoration" (emphasis added).) Stated differently, the "period of restoration" is not simply a "time limit on available coverage, which ends whenever such measures, if undertaken, would have been completed with reasonable speed and similar quality," as the Superior Court suggested. *Ungarean*, 286 A.3d at 377. Rather, the "period of restoration," and the loss of income during that period, is required for the Business Income and Extra Expense Endorsement to apply under the CNA Policy.

Consequently, for the "period of restoration" language to have any effect, there must be some physical alteration to the subject property necessitating repairs, rebuilding, or entirely replacing the property either at the same location or a new one. As explained above, when interpreting an insurance policy, the policy must be read as a whole to give effect to all its provisions and to properly ascertain the intent of the parties in drafting the agreement. *Pa. Nat. Mut. Cas. Ins. Co.*, 106 A.3d at 14. As a result, we agree with CNA that to permit coverage under the CNA Policy where a business has sustained solely economic losses unrelated to any physical alteration to the subject property would render the "period of restoration" language superfluous.

In short, we conclude that the language of the CNA Policy is not ambiguous because it is subject to only one reasonable interpretation. That is, for coverage to apply under the CNA Policy, there must be a physical alteration to the subject property as a result of a direct physical loss or damage necessitating repairs, rebuilding, or entirely replacing the property. As applied to the present case, we fail to find any facts in the record suggesting that the Covered Properties required these necessary actions in order to trigger coverage under the CNA Policy. As CNA explains, Ungarean did not lose access to the Covered Properties during the government-ordered COVID-19 shutdown whatsoever; Ungarean could enter the Covered Properties at will and Ungarean's business remained open for emergency dental procedures. The only loss Ungarean sustained, rather, was *pure* economic loss because the government-ordered COVID-19 shutdown prevented Ungarean from operating his Covered Properties at their full potential. That partial closure, however, had nothing to do with the physical attributes of the Covered Properties, as required by the CNA Policy for insurance coverage. [6]

---

[6] For similar reasons, to the extent that in narrow circumstances, a "loss of use" might constitute a "physical loss," the "loss of use" must still be *physical* for coverage to apply under the CNA Policy. *See Wilson*, 57 F.4th at 144-45 ("There can be physical loss without damage, such as the case of a landslide leaving a home standing on the edge of and partially overhanging a newly-formed 30-foot cliff without physically damaging the structure itself, . . . or a portable grill or a delivery truck being stolen without a scratch . . . . [T]he definition of the term 'loss' can include loss of use. But it does not follow that every loss of use is necessarily a physical loss, and . . . there was no physical loss here.") (quotations, alterations, and citations omitted); *id.* at 142 (where alleged loss is caused "by sources unnoticeable to the naked eye[,]" plaintiff must prove "its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable") (quotation, citation, and emphasis omitted); *id.* at 145 ("the presence of a dangerous substance alone does not constitute a loss; there is no physical loss until the substance is in such form or quantity as to make the building unusable") (quotation and citation omitted); *see also* CNA Reply Brief at 4-5 (conceding where "the property at issue was rendered useless or uninhabitable, [it] is unquestionably a 'physical' loss because the policyholder has been deprived of tangible possession"). As explained above, any loss of use caused by the (continued…)

What's more, Ungarean does not allege that the COVID-19 virus was on the Covered Properties or caused any physical damage thereto at any time during the government-ordered shutdown that might somehow trigger insurance coverage under the CNA Policy. Stated differently, the sole reason Ungarean's business suffered financial losses during the period in question was due to the government-ordered shutdown, not any alleged physical condition of the Covered Properties. In addition, we reject the rationale of the trial court and the Superior Court that COVID-19 required "many physical changes to business properties across the Commonwealth," such as "the installation of partitions, additional handwashing/sanitization stations, and the installation[] or renovation of ventilation systems" that would constitute repairing, rebuilding, or replacing the subject property under the "period of restoration" language of the CNA Policy. *Ungarean*, 286 A.3d at 376-77. Adding *new* installations that do not correct a physical attribute of the property does not constitute repairing, rebuilding, or replacing the *existing* property as a result of a physical loss or damage. To hold otherwise would clearly "distort the meaning of the [CNA Policy's] language [and] resort to a strained contrivance." *Madison*, 735 A.2d at 106.

---

government-ordered shutdown was not a physical loss of use—Ungarean still had the full ability to physically access the Covered Properties, and he did so for emergency dental procedures. The limitations on the way he used the Covered Properties were legal limitations, and, as noted, he suffered economic harm only. We likewise reject amicus Penn Entertainment's argument that a loss of use is physical where the insured loses its ability "to use [its] 'tangible' and 'concrete' business premises." Penn Entertainment Amicus Brief at 7. Under the CNA Policy's language, the adjective "physical" modifies "loss of or damage to;" it does not modify "Covered Property." In fact, reading the CNA Policy as Penn Entertainment suggests would render the word "physical" superfluous in most (if not all) of CNA's policies, which insure physical properties. *See* CNA Policy at 1, A.1a, b. (defining "Covered Property" as including "Buildings" and "Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises[.]").

Moreover, the same rationale we applied to conclude that Ungarean is not entitled to coverage under the Business Income and Extra Expense Endorsement likewise applies to preclude any coverage under the Civil Authority Endorsement. The Civil Authority Endorsement requires a civil authority order that causes a loss of access to the Covered Properties due to "direct physical loss of or damage to" property *other* than the Covered Properties. Ungarean simply asserts that, because it suffered a "direct physical loss of or damage to" the Covered Properties as a result of the government-ordered COVID-19 shutdown, other properties did as well, and the Civil Authority Endorsement, therefore, is satisfied. As explained, however, that is not the case. Because the government-ordered COVID-19 shutdown cannot constitute "direct physical loss of or damage to" *any* property, the Civil Authority Endorsement simply does not apply. Our primary conclusion also renders unnecessary any discussion of the exclusions in the CNA Policy that might, nonetheless, deny Ungarean coverage.

Finally, in reaching our conclusion, we are aware that our decision is in accord with the prevailing view of courts from varying jurisdictions when faced with the interpretation of markedly alike insurance policy language. *See, e.g., Sandy Point*, 20 F.4th at 337; *Wilson*, 57 F.4th at 138; *MacMiles*, 286 A.3d at 332. We emphasize, however, that our decision rests solely on the language of the CNA Policy and not the conclusions of other courts interpreting separate, albeit similar, insurance policy language. As indicated above, the "polestar of our inquiry . . . is the language of the insurance policy" at issue, not the decisions of other courts. *Madison*, 735 A.2d at 106.

## IV. CONCLUSION

For the reasons set forth above, we conclude that Ungarean is not entitled to insurance coverage under the plain and unambiguous language of the CNA Policy because the Covered Properties did not sustain any physical loss or damage.

Accordingly, we reverse the judgment of the Superior Court and remand to the Superior Court with instructions to remand to the trial court to enter summary judgment in CNA's favor.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and McCaffery join the opinion.